We'll move to our final case of the day, Taylor v. Kijakazi, Appeal No. 21-1458. We have Ms. Siebold and Ms. Payne. Ms. Siebold for the appeal. Good morning, Your Honors.  My name is Stephanie Siebold and I represent Plaintiff Appellant A.B. Taylor. Your Honors, this is, as you know, a disability case involving a plaintiff with failed back syndrome. The major issues in this case revolve around the ALJ's treatment of the plaintiff's physical exams, residual nerve problems following his second lumbar surgery, and exhaustion of medical treatment. Just by way of history, the plaintiff's problems with his back began as far back as 1999 when he underwent his first lumbar spine surgery. However, his back was okay until after he suffered a work injury to his back in 2010 while cleaning out a machine with an industrial vacuum. Thereafter, a plaintiff engaged in treatment on a monthly basis. Because this case is an SSI filing, the earliest that plaintiff can establish disability is back to his filing date in 2016, but we do have longitudinal records going back to 2010, which were submitted to Social Security. I mentioned that at the outset because it's unusual, I think, to have this lengthy history of evidence showing how plaintiff, how his symptoms progressed since the work injury between 2010 and when he filed for SSI through the 2018 hearing decision from the ALJ. So I think this case is a wealth of longitudinal evidence which provides background and facts that the ALJ ultimately didn't really, in our arguments, use in its analysis in the decision. Following the 2010 work injury, plaintiff underwent a second lumbar surgery in December 2011. Following the second surgery, it's important to note that he was diagnosed with failed back syndrome because of ongoing pain and lumbar radiculopathy. He underwent epidural steroid injections before that second surgery, but then he also underwent multiple epidural steroid injections post-second surgery. And later on, around 2016, underwent a failed spinal column stimulator placement. The spinal column stimulator was removed after, I think, a three-day trial because of cardiac complications and lack of efficacy for plaintiff's pain. Plaintiff, I think it's important to note here that plaintiff was consistently on multiple heavy narcotics between 2010 and 2018. These included Dilaudid and Opana. I think he was on approximately three different pretty heavy narcotics throughout 2010 to 2018. So we can see in this record that plaintiff is consistently on these very heavy-duty medications. You make that argument, but did the IJ really didn't seem to spend any time on that argument? And talk about any kind of impairment that the man may have had that would have affected his use of machinery or anything of that nature? Why not? So, Your Honor, that's one of the points to our arguments here is we feel that the ALJ ignored essentially a line of evidence regarding plaintiff's heavy narcotics. Was an argument really made to the IJ on that point? So I know that there was a pre-hearing memorandum made to the ALJ that outlined his physical examinations. I believe the narcotics was mentioned in that argument. The point was also raised in the Appeals Council. I don't know if the precise argument made was that plaintiff would be off task because of the medicine usage, but I think that it can be gleaned by the fact that that was highlighted. And I believe plaintiff also testified to ongoing problems with pain and dysfunction. Is there specific evidence from medical sources about side effects that were disabling for Mr. Taylor? So unfortunately, Your Honor, in this case, we've got kind of a host of opinions made in between 2010 and 2013, which is when I think plaintiff's workers' compensation case was pending. And at that time, plaintiff had not yet exhausted all of his treatments. Subsequently, there are, after 2013, which I think was the third IME opinion from Dr. Nancy Lipson, I don't believe there was any additional opinions made by plaintiff's treating sources. There is one note in November of 2016 by Dr. Santiago from Christie Clinic, and he mentions that plaintiff's still not able to work. I thought that was a report on what the plaintiff himself was telling the doctor. Right. It could be taken as a subjective complaint. However, I think it's important to note that the doctor doesn't disagree with it or state any disagreement with that. Additionally, I guess the most recent opinions were made by the state agency consultants. And within the DDS opinions made, there is a reference that plaintiff could be off task. But as I think is common with the DDS opinions, there's not really a space for them to delineate how off task he would be. Has any doctor recommended restrictions that were greater than the ALJ applied in this case in his or her finding on the residual functional capacity? Your Honor, I would say that that would not... I don't know that we could say that there is a doctor that has explicitly opined on residual functions that are greater than what the ALJ opined in his RFC analysis. However, I think that's outside of... I think that it's important to note that it was incumbent upon the ALJ to support his RFC findings with substantial evidence. And the opinions that the ALJ claimed to have given great weight to in this case included a 2010 opinion that was made within the first three months of plaintiff's work injury. Right. That's Dr. Jones. Yes. Yeah. But I understand that point. But as you know, the government has responded by saying, well, ultimately, though, it's still the plaintiff's burden to show total disability. And if there's not medical evidence pointing to more stringent restrictions, that's a pretty tough showing. So we'd argue, Your Honor, that the ALJ didn't support his analysis of how he evaluated the opinions in this case and that there's no opinion on equaling in this. Can you tell me what's your view with respect to the IJ's treatment of Dr. Santiago's analysis? So, Your Honor, the ALJ's treatment of Dr. Santiago's analysis is that the ALJ had, I think, said that he gave Dr. Santiago some weight. And Dr. Santiago had opined, I think, a couple different lifting restrictions at some point. His was, I think his last opinion was made in 2013. And the ALJ said that he gave him some weight. But ultimately, I think that the ALJ didn't have any, he didn't rely on the DDS opinions, which were the most recent opinions made in this case. That's the state agency. Yes, the state agency consultants. Hold on. I thought the ALJ did. He gave them some weight. So he gave Dr. Jones, who evaluated plaintiff in the first three months of his treatment, great weight. Right. And the state owned consultants, he gave them some weight or possibly partial weight. But similarly, the same vein of treatment for both of them. Dr. Jones had seen your client before he really had received, well, certainly before there was any improvement in his condition, right? Right. She saw him within the first three months of 2010, I think. So relying on her testimony is really giving your client the benefit of the doubt. It's not, he got better. And the ALJ seems to be saying, I'm going to give, I'm really going to give a lot of weight to the testimony of how he was right after the accident. Does it really prejudice you that he gave great weight to Dr. Jones' testimony? So I would say so because Dr. Jones, because he doesn't articulate in his analysis how he evaluated Dr. Jones' opinion very well. There's multiple opinions made by Dr. Jones, including at the very end of her, I think, three months of treatment with him, that plaintiff was released full duty. And this was before he had even had an MRI of his back. So while the ALJ and the commissioner have taken the position that, well, the ALJ gave more restrictions. So any analysis deficiency is harmless. I don't think we can say that here, especially given the treatment of listing 1.04A and no at work. So while plaintiff was not able to produce an opinion contrary, I don't think that takes away from the ALJ's burden to support his analysis with the logical bridge. I guess the biggest problem you have that you have to deal with is that the restrictions placed on your client's ability to work by the IJ were certainly greater than any of the medical testimony. He really gave your client the benefit of the doubt, didn't he, the ALJ? So one thing I would point out, though, is in the ALJ's analysis, he consistently reports that plaintiff's able to engage in ADLs. He's riding a bike. There's a suggestion that plaintiff's in decent shape, that he can do sedentary work on a full-time basis, and that the ALJ's crediting his pain. But if you look at the analysis of the medical records here, the ALJ is not really taking into account that plaintiff's exhausted his treatment. He's tried a spinal column stimulator. He's still in significant pain. And there's multiple notes about plaintiff's quality of life in 2016 and 2018. And plaintiff ultimately testified at the hearing that he would need to lie down in the workforce and that he was in significant discomfort. So ultimately, we'd argue that the ALJ did not consider that aspect of the ALJ's case, did not build a logical bridge. If no further questions, I will reserve a minute for rebuttal, if possible. Your time's up, but probably you can have a minute. Ms. Payne? Good afternoon, your honors. May it please the court. Lindsay Payne on behalf of the Acting Commissioner of Social Security. There are six opinions in this case, and none of them contain limitations greater than found by the Administrative Law Judge. That is substantial evidence that this court should affirm. The opinions range from finding that Taylor could perform sedentary work to finding that he had unlimited work abilities. The Administrative Law Judge— The latter seems preposterous under these circumstances. Well, and of course, and the Administrative Law Judge, or ALJ, of course did not adopt that. The Administrative Law Judge went with the most restrictive opinions, taking the most restrictive parts of each opinion and combining them to assess a residual functional capacity for a limited range of sedentary work, and even crediting Taylor's own assertion that if he were to perform sedentary work, he would need to switch between sitting and standing. On this record, he cannot establish error. If we look at the lines of evidence that Taylor claims the ALJ ignored, the ALJ actually confronted and discussed all of this. With respect to narcotics, as opposing counsel was discussing, it is true that he was taking narcotics. The ALJ acknowledged that in his decision. However, even in Taylor's brief before this court, he says, well, the ALJ didn't adequately discuss narcotics and potential side effects, but he cites no potential side effects in his brief. He does not cite anywhere in the record where Taylor asserted to his providers that he was experiencing side effects. Instead, he was saying things like, I'm taking a trip. I would like an increase in my dose to be able to drive down to Alabama. And his doctor is saying, sure, we can do that. He's reporting that his narcotics are providing him with a good quality of life. They're allowing him to bicycle, those types of things. So without him being able to cite to evidence that he was experiencing side effects, there wasn't more for the ALJ to be discussing. Additionally, we have the six opinions. Those six opinions were evidence that the ALJ could rely on. Those doctors, which included Taylor's own treatment providers, in addition to the state agency doctors, did not find that he was going to be experiencing disabling side effects from his narcotics. As pointed out in the agency's brief, the portion of the state agency opinion that Taylor points to as suggesting that the state agency doctors said he had side effects, that was state agency doctors reciting his allegations. That was not a portion of the state agency opinions. The state agency doctors, in their opinions, did not find any side effects from narcotics. With respect to the rest of his course of treatment, again, the ALJ acknowledged that the spinal cord stimulator trial was not a success, but the ALJ looked at overall Taylor's functioning prior to and after the trial. Shortly before the trial, Taylor was assessed by a neuropsychologist in advance of the trial. The neuropsychologist observed he was not exhibiting pain behaviors. He wasn't shifting in his seat. He didn't need to switch between sitting and standing. And when a fire broke out in a nearby office, he was easily able to evacuate by stairs. He has the trial. It doesn't work. Then he tries ablation procedures and reports that those do work. Those provide him with 50% pain relief in his back. So over the course of time, we're actually seeing improvement. This was evidence that the ALJ could reasonably rely on. Ultimately, Taylor's taking issue with the weight that the ALJ assigned to individual pieces of evidence, and that is not a basis for remand. Can you comment on the ALJ's decision, though, to afford great weight to the opinions back in 10 and 11 from Drs. Fletcher, Jones, and Santiago? Is it, is your view that the reason the ALJ was doing that for the reason that Judge Ripple suggested in his question, or is there some other reason? I think that, I think it's for the reason that Judge Ripple suggested. The ALJ, in doing so, even acknowledged in his opinion, he's saying, despite the fact that these opinions are remote in nature, I'm going to find that Taylor is more limited than the state agency doctors suggested. And because I'm finding him more limited, and because I'm finding these limitations to, for example, lifting 10 pounds as Dr. Fletcher found in 2010, because I'm finding him that limited, I'm going to give great weight to these opinions that are according more closely to Taylor's own allegations of pain over the longitudinal record. So I think that the record does support that the ALJ gave Mr. Taylor the benefit of the doubt here. And even if it couldn't be viewed that way, with six medical opinions, all of which have Taylor being able to work, and none of which are more restrictive than the residual functional capacity assessed by the ALJ, he simply cannot show error here. This court has been clear that there is not error in the ALJ's consideration of opinion evidence unless there is an opinion that is more restrictive. If I could briefly address one of the issues in the briefing on the listings, there's been some debate between the parties on this question of whether there was evidence of motor, sensory, and reflex testing in the record. Taylor suggests in his reply brief that Dr. Santiago's references to MSRs more likely meant muscle stretch reflex. But if he is correct, then that simply goes to show that the ALJ had evidence of normal reflex testing from Dr. Santiago and accurately noted that. And Taylor seems to acknowledge in his reply brief that the record did not contain evidence of either abnormal sensation or reflex testing. He states at page two of his reply brief, quote, plaintiff did not necessarily have abnormal reflexes or sensory loss. Listing 1.04a on its face unequivocally requires either sensory or reflex loss to establish that the listing has been met. On this record, he cannot establish that he's met the listing and substantial evidence supported the ALJ's decision. If the court has no further questions, I would ask that you affirm the decision below. Thank you, Ms. Bain. Rebuttal, Ms. Sebald. Thank you, Your Honor. Just very briefly, we would argue that the ALJ did not give plaintiff the benefit of the doubt and that the ALJ relied on a skewed version of the facts. Though the commissioner and the ALJ state that plaintiff was able to go on vacation, he walked down flights of stairs, the file actually shows that plaintiff consistently complained that he wasn't able to function in most activities. When he went to vacation in Florida, he was not able to go to the beach or the ocean. That's in the record at page 571. When he underwent psychological testing regarding the spinal column stimulator, he was not able to participate in testing after, I think it was about an hour and a half. That's in the record at page 241. Regarding the 1.04a analysis, even if reflex testing is not supported in this file, abnormal reflex testing that is, there's multiple notes in here of plaintiff having tenderness on examination, positive slump tests, post-second surgery. We'd like to highlight that an EMG was positive for radiculopathy at a different level that wasn't operated on, which was L2, L3. So there's definitely issues with the nerves here, and the 2012 EMG showed nerve irritation. So I just wanted to highlight that. Could I ask you, when is the last evidence of nerve compression? So, yes, it depends on how you interpret last evidence of nerve compression. EMG was in March of 2012. In July, at page 616, in July of 2012, plaintiff sees Dr. Atwater, who says that the MRI shows a potential recurrent herniation at L1-2. That's at 484. And then there's positive slump testing throughout the record, which has been interpreted by district courts in other cases to be consistent with nerve compression. Thank you very much. All right. Thank you very much to both counsel. The case will be taken under advisement, and the court will recess until tomorrow.